2026 IL App (4th) 260403-U

NOS. 4-26-0403, 4-26-0405, 4-26-0406, 4-26-0407 cons.

NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 11, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Y.C., D.C., T.C., and L.C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | Nos. 23JA427 |
| v. | ) | 23JA428 |
| Kayla D., | ) | 23JA429 |
| Respondent-Appellant). | ) | 23JA430 |
| | ) | |
| | ) | Honorable |
| | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court granted appellate counsel's motion to withdraw and affirmed, finding the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence.

¶ 2        In January 2026, the State filed a petition for termination of parental rights against respondent, Kayla D., the mother of Y.C. (born in January 2022), D.C. (born in November 2018), T.C. (born in May 2014), and L.C. (born in June 2013). In March 2026, the trial court granted the petition and terminated Kayla's parental rights.

¶ 3        On appeal, appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re S.M.*, 314 Ill. App. 3d 682 (2000), arguing Kayla's appeal presents no potentially meritorious issues for review. We grant the motion and affirm the

trial court's judgment.

¶ 4                                I. BACKGROUND

¶ 5        On November 22, 2023, the State filed petitions alleging Y.C., D.C., T.C., and

L.C. were neglected because their environment was injurious to their welfare and they were left

without supervision for an unreasonable period of time without regard for their mental or

physical health, safety, or welfare (705 ILCS 405/2-3(1)(b), (d) (West 2022)). The petitions

alleged Kayla and the children's father "ha[ve] a history of engaging in acts of domestic

violence," and the children "have been left home alone for an unreasonable period of time,"

thereby placing them at risk of harm. On the same day, the trial court conducted a shelter care

hearing and entered an order placing the children's temporary custody and guardianship with the

Illinois Department of Children and Family Services.

¶ 6        On January 2, 2026, the State petitioned to terminate Kayla's parental rights,

alleging she was an unfit parent because she failed to make reasonable efforts or progress toward

the children's return to her care during the nine-month periods from March 28, 2024, to

December 28, 2024, and from December 29, 2024, to September 29, 2025. See 750 ILCS

50/1(D)(m)(i), (ii) (West 2024).

¶ 7                               A. Fitness Hearing

¶ 8        The trial court conducted a fitness hearing on February 12, 2026. Kayla failed to

appear, and the court denied counsel's motion to continue the hearing. Lisa Entrekin, a foster

care supervisor for the Youth Services Bureau (YSB), testified she was assigned to the children's

cases. Entrekin performed Kayla's intake meeting and provided her with the caseworker's

contact information. Entrekin testified, "Sometimes [Kayla's] mental health impeded her

understanding or acknowledging the things that were being discussed." There was a history of

- 2 -

domestic violence between Kayla and the children's father, including instances of violence occurring in the children's presence. Kayla could be "very angry" and "[v]ery dismissive," and she was not always in a mental health position to engage in "a full and fair dialogue." She would often "yell[ ] about how she knows how to parent her kids and didn't need services in order to do so."

¶ 9    Entrekin testified Kayla's initial service plan recommended she comply with random drug drops and complete domestic violence services, parenting education, and individual psychotherapy. YSB made the service plan available to Kayla so she could see what was expected of her. In May 2024, Kayla's progress on all recommended services was "unsatisfactory." She was incarcerated for approximately three months, beginning in February 2024. When she was released, she demanded that YSB obtain housing for her, and she refused to engage in services until she had housing. Kayla received a housing advocate, and YSB gave her contact information for local housing resources, but she "continued to demand that [YSB] pay and provide the housing."

¶ 10    In November 2024, Kayla's progress remained "unsatisfactory" because she had not engaged in any of the recommended services. She failed to appear at drug drops, and when she did appear, she tested positive for tetrahydrocannabinol (THC). She did not participate in domestic violence services or parenting classes. She did not complete a psychiatric evaluation. She participated in mental health therapy "at one point," but she did not continue to do so. Kayla's visitation was supervised because she had not shown "any progression in change of behavior, change of attitude, or even had a positive report from any provider."

¶ 11    In April 2025, Kayla was still not engaged in any services, and her rating continued to be "unsatisfactory."

¶ 12　　　　In November 2025, Kayla was once again rated unsatisfactory because she was not engaged in services. She had participated in a domestic violence assessment, but she was removed from the course after not attending classes. She reported that she completed a mental health assessment, but she did not engage in any subsequent treatment. She became "very inconsistent with visitation." As a result, YSB suspended Kayla's weekly scheduled visits and asked to schedule a child and family team meeting, but Kayla refused to meet with them. Entrekin testified that all of Kayla's service plan requirements remained outstanding, and "[n]othing had been completed." At the time of the hearing, Kayla had had no contact with the children since July 2025.

¶ 13　　　　Jennfier DeLeo testified she was the children's primary caseworker. DeLeo concurred with and endorsed Entrekin's testimony, describing it as a thorough and complete recitation of Kayla's lack of engagement with services.

¶ 14　　　　The trial court found the State had shown, by clear and convincing evidence, that Kayla was unfit because she failed to make reasonable efforts or reasonable progress during the relevant nine-month periods. The court observed Kayla did not complete any of the recommended services, all her service plans were rated "unsatisfactory," and she "rarely engaged" in the case from its inception.

¶ 15　　　　　　　　　　　B. Best-Interests Hearing

¶ 16　　　　The matter proceeded to a best-interests hearing, which Kayla attended. DeLeo testified the children were placed with fictive kin. They lived in a single-family home with enough space for all four children. The children had adequate food, clothing, and shelter. They were "very attached" to their foster parents, and they relied on their foster parents "for everything." Their foster parents treated them "like family." The foster parents were active and

- 4 -

involved in the children's education, and all four children were signed up for tutoring. The children appeared comfortable in their foster home, and they relied on their foster parents to meet their emotional needs. DeLeo believed the children wanted to have a relationship with their biological parents, and the foster parents were willing to facilitate those relationships "if there [were] no negative reactions from the children." The foster parents were willing to provide permanency by adopting the children. Based on her observations, DeLeo testified the children felt a "sense of home and place" with their foster parents. DeLeo explained the difference between adoption and guardianship to the children, and all four children indicated they wanted to be adopted by their foster parents, whom they called "Godmom" and "Goddad."

¶ 17    During cross-examination by the guardian *ad litem* (GAL), DeLeo testified T.C. was initially "very hesitant" about the possibility of adoption. T.C. spoke with DeLeo and asked many questions. YSB connected T.C. with a counselor to help her work through this process. T.C. did not want to "abandon [Kayla] in case she needed help." The foster parents communicated they were willing to allow Kayla to have contact with the children, "especially to help them process this."

¶ 18    Kayla testified the children were her "best friends," and she had "never done anything wrong to them." She believed it was in the children's best interests to be with her, but she stated, "[I]f it's that hard on the Court, guardianship would probably be best."

¶ 19    The GAL proffered that she visited the foster home on September 17, 2025, and spoke with all four children. During the initial portion of the conversation, the two younger children, Y.C. and D.C., "strongly voiced that they had a desire" to be adopted by their foster parents, after which they "decided *** they wished to go play and not ask any further questions." The GAL then spoke with L.C. and T.C. separately, both of whom expressed concern for Kayla's

well-being. T.C. "was struggling with her thoughts and feelings about *** not being there for [Kayla]." L.C. told the GAL that "she felt a little abandoned." The GAL proffered that she left the visit with the knowledge that "these children are well cared for in their foster home but were definitely in the process of working through the decision about a goal change and had all agreed that they felt safe and appropriate with their foster family, and they wish to be part of that foster family."

¶ 20 The trial court found it was in the children's best interests to terminate Kayla's parental rights. The court asserted, "It is clear that the children are integrated into this family and comfortable." The court observed the foster parents took care of the children, and the children "look[ed] to these foster parents for comfort and safety." The court emphasized it was not in the children's best interests "to linger in the foster care system indefinitely while we wait for parents to achieve a level of fitness that allows reunification."

¶ 21 This appeal followed.

¶ 22 II. ANALYSIS

¶ 23 In June 2026, Kayla's appellate counsel filed a motion seeking leave to withdraw as counsel. Kayla did not file a response. Counsel asserts no arguably meritorious issue can be raised on appeal. We agree.

¶ 24 A. Standard of Review

¶ 25 To terminate an individual's parental rights, the State must first show the parent is unfit by clear and convincing evidence and then show that terminating their parental rights serves the child's best interests by a preponderance of the evidence. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). We will not reverse an unfitness finding unless it is against the manifest weight of the evidence, as such a determination "involves factual findings

and credibility determinations that the trial court is in the best position to make." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. Likewise, we will not reverse a best-interests finding unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 26                                    B. Unfitness Finding

¶ 27        The Adoption Act provides several grounds on which a trial court may find a parent unfit. See 750 ILCS 50/1(D) (West 2024). Those grounds include a parent's failure to "make reasonable efforts to correct the conditions that were the basis for the removal of the child *** during any 9-month period following the adjudication of neglected or abused minor" and their failure to "make reasonable progress toward the return of the child *** during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(m)(i), (ii) (West 2024). When determining whether a parent made "reasonable efforts," we apply "a subjective standard that refers to the amount of effort that is reasonable for that parent." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 44. "The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home." *Za. G.*, 2023 IL App (5th) 220793, ¶ 44. "[R]easonable progress" means "measurable or demonstrable movement toward the goal of the return of the child." *In re L.L.S.*, 218 Ill. App. 3d 444, 460-61 (1991). We have described "reasonable progress [a]s an objective standard," measuring whether "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 28 There is no issue of arguable merit concerning the trial court's unfitness finding. The evidence supports the court's determination that Kayla failed to make reasonable efforts or reasonable progress toward the children's return during the specified nine-month periods. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2024). Kayla's service plans recommended that she complete domestic violence services, parenting education, and individual psychotherapy and that she comply with random drug drops. During the case's pendency, Kayla completed none of these services. Each service plan rated Kayla's compliance as "unsatisfactory." She did not participate in domestic violence services or parenting classes. She did not complete a psychiatric evaluation. She participated in mental health therapy "at one point," but she did not continue to do so. She failed to appear at drug drops, and when she did appear, she tested positive for THC. Kayla insisted she "knows how to parent her kids and didn't need services in order to do so." Her testimony indicates she believes she did nothing wrong. As a result, she did not make "committed and diligent efforts" to correct the conditions that led to the children's removal from her care. *Za. G.*, 2023 IL App (5th) 220793, ¶ 44. Additionally, Kayla did not make sufficient progress, such that the children could have been returned to her care in the near future. See *F.P.*, 2014 IL App (4th) 140360, ¶ 88. Accordingly, the court's unfitness finding was not against the manifest weight of the evidence. *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

¶ 29 C. Best-Interests Determination

¶ 30 Once a trial court finds a parent unfit, it must consider whether terminating their parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364 (2004). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the

- 8 -

context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2024). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 31 There is no issue of arguable merit regarding the trial court's best-interests finding. The children's foster parents provided adequate food, clothing, and shelter. The foster parents treated the children like family, and the children were "very attached" to their foster parents. The children felt a "sense of home and place" with their foster parents. The foster parents were actively engaged in the children's education, and they provided for the children's emotional needs. The foster parents were willing to facilitate a continued relationship between the children and their biological parents. The foster parents were willing to provide the children with permanency by adopting them, and the children wanted to be adopted by them. Based on this evidence, the court determined it was in the children's best interests to terminate Kayla's parental rights. We cannot say "the opposite conclusion is clearly apparent," nor can we find the

court's decision to be "unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 32                    D. Denial of Motion to Continue

¶ 33        The trial court also did not err in denying Kayla's counsel's motion to continue when Kayla failed to appear at the fitness hearing. "[A] party has no absolute right to a continuance." *In re Tashika F.*, 333 Ill. App. 3d 165, 169 (1999). "[T]he denial of a request for a continuance will not be grounds for reversal unless the complaining party has been prejudiced by such denial." *Tashika F.*, 333 Ill. App. 3d at 169. No reason was given for Kayla's absence from the fitness hearing. Counsel cross-examined witnesses and argued on Kayla's behalf. When Kayla appeared for the best-interests hearing, the court gave her time to confer with counsel regarding the possibility of signing consents. No arguably meritorious issue can be raised that Kayla was prejudiced by the court's denial of counsel's motion to continue or that the court abused its discretion in doing so. See *Tashika F.*, 333 Ill. App. 3d at 169.

¶ 34                         III. CONCLUSION

¶ 35        We agree with appellate counsel this appeal presents no issue of arguable merit. Accordingly, for the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 36        Affirmed.